**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Central Arizona Water Conservation District,<br><br>Plaintiff,<br><br>v.<br><br>United States Army Corps of Engineers,<br><br>Defendant. | No. CV-18-00724-PHX-DLR<br><br>**ORDER** |

Before the Court is Plaintiff Central Arizona Water Conservation District's ("District") motion for a temporary restraining order (TRO). (Doc. 7.) The motion is fully briefed (Doc. 17) and the Court heard oral argument on March 9, 2018. At the hearing, the Court denied the District's motion and informed the parties that this written order would follow.

**I. Background**

The Alamo Dam ("Dam") is owned, operated, and maintained by Defendant United States Army Corps of Engineers ("Corps"). The Dam is located between Alamo Lake and the Bill Williams River. On March 2, 2018, the Corps issued an Environmental Assessment (EA) and a Finding of No Significant Impact (FONSI) for the Alamo Dam Flushing Release. The release, which is the first step in the Corps' efforts to conduct long overdue maintenance on the Dam, is intended to remove accumulated sediment from the Dam and lower the water elevation in Lake Alamo so as to increase diver safety. The

1 proposed release is scheduled to last 19 days, starting at 8:00 a.m. on March 12, 2018.

The District owns and operates a water intake and pumping plant in Lake Havasu, adjacent to the mouth of the Bill Williams River, approximately 39 miles downstream from the Dam. Concerned that the Corps failed to take into account the environmental impact of its release, specifically increased downstream turbidity, the District filed this lawsuit on March 6, 2018, alleging violations of the National Environmental Policy Act (NEPA).[1] Concurrent with the complaint, the District filed the motion at issue, which requests that the Court temporarily enjoin the Corps from initiating the scheduled release.

## II. Legal Standard

The standard for issuing a TRO is identical to the standard for issuing a preliminary injunction. *Whitman v. Hawaiian Tug & Barge Corp./Young Bros., Ltd. Salaried Pension Plan*, 27 F. Supp. 2d 1225, 1228 (D. Haw. 1998). A plaintiff seeking a TRO must establish that he is likely to succeed on the merits and to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). These elements are balanced on a sliding scale, whereby a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131, 1134-35 (9th Cir. 2011). The sliding-scale approach, however, does not relieve the movant of the burden to satisfy all four prongs for the issuance of a TRO. *Id.* at 1135. Instead, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a [TRO], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the [TRO] is in the public interest." *Id.* at 1135. The movant bears the burden of proof on each element of the test. *Envtl. Council of Sacramento v. Slater*, 184 F. Supp.

---

[1] Turbidity is the cloudiness or haziness of water and is a key test of water quality. The metric for measuring turbidity levels is called nephelometric turbidity units (NTUs). According to the District, turbidity levels between 20 and 50 NTUs can require it to shut down its pumping plant. (Doc. 7 at 24.)

2d 1016, 1027 (E.D. Cal. 2000).

## III. Discussion

### A. Likelihood of Success on the Merits

The purpose of NEPA is "to establish procedural mechanisms that compel agencies, such as the Corps, to take seriously the potential environmental consequences of a proposed action. [Courts] have termed this crucial evaluation a 'hard look.'" *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) (citation omitted). Under NEPA, a federal agency is required to prepare, "to the fullest extent possible," an environmental impact statement for "every . . . major Federal actio[n] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency, however, is not required to prepare a full Environmental Impact Statement (EIS) if it determines, based on the EA, that the proposed action will not have a significant impact on the environment. 40 C.F.R. §§ 1508.9(a), 1508.13.

Plaintiff's primary contention is that the Corps' failure to conduct an EIS was a result of its arbitrary and capricious decision to limit the project area in the EA to the mouth of the Bill Williams River and to not consider the effects of the release on Lake Havasu. Specifically, the District contends that the Corps erred in its position that it need not conduct a new EIS with respect to the Lake Havasu area because its effects "have been previously evaluated in the 1999 EIS." (Doc. 7-4 at 10.) The District challenges the accuracy of this position and asserts that the proposed agency action is unlawful because the Corps' failed to consider its foreseeable effects. (Doc. 7 at 15-16.)

In support of its contention, the District cites to the 1999 EIS, which states in relevant part,

> Larger discharges into the Bill Williams River would result in substantial benefits to downstream riparian vegetation, while increasing turbidity and sedimentation within the river. Since these releases would be generally short term in nature and would mimic the natural conditions in the river before construction of Alamo Dam, this impact is not considered

(Doc. 7-9 at 4.) The District argues the Corps' reliance on the 1999 EIS is misplaced

because the 1999 EIS did not expressly discuss the Lake Havasu area. In response, the Corps contends that Lake Havasu is included in the term "downstream" because it is located downstream from the Bill Williams River. (Doc. 17 at 18.)

Given the ambiguous language of the 1999 EIS, the District has raised some questions going to the merits of its underlying claim, though the Court is not confident that these questions are serious enough to support the issuance of a TRO. Regardless, however, the District's motion for a TRO is denied because it has not demonstrated a likelihood of irreparable harm or that the balance of equities tips sharply in its favor.

**B. Irreparable Harm**

The District argues that the Corps' planned release will significantly increase turbidity at the intake for its pumping plant, and that the increased turbidity will persist for a week or more. As a result, the District will face increased maintenance costs stemming from pumping water with elevated turbidity. Additionally, when the turbidity elevates beyond a certain threshold, the District will be forced to completely shut down its plant until the elevated turbidity abates. (Doc. 7 at 23-24.)

The District's concern over elevated turbidity levels is too speculative to support the issuance of a TRO. In support of its claim, the District cites United States Geological Survey (USGS) studies that document water releases from the Dam in the spring of 2005, 2006, and 2010. (Doc. 7-3 at 39, 45.) The 2005 release caused the District's intake to experience turbidity levels exceeding 20 NTUs, which persisted for significant periods of time. The conditions of the 2005 release, however, were so unlike the conditions of the Corps' current proposed release that it offers little comparative value. For example, the duration and velocity of the 2005 release far exceeded the Corps' proposed release. The 2005 release flowed at a velocity ranging from 6,000-7,300 cubic feet per second (cfs) for 168 hours, whereas the Corps' planned release peaks at 5,000 cfs for only 12 to 13 hours. Additionally, in 2005 the conditions between the Dam and Lake Havasu were not conducive to absorbing the water flow because of recent rainfall and earlier releases. These same conditions do not exist here.

1    Instead, the 2006 and 2010 releases offer better evidence of the likely result of the Corps' release. Much like the proposed release, the 2006 and 2010 releases confined their peak flow to a shorter duration.[2] Moreover, unlike the 2005 release, the conditions between the Dam and Lake Havasu in 2006 and 2010 were better suited to absorb the increased water flow. The result: the 2006 release did not cause excessive turbidity increases and, although the 2010 release did, the elevated turbidity levels abated to a safe level within a day or two.[3] For these reasons, the Court finds that the District's allegations of harm are too speculative.

**C. Balance of the Equities**

When balancing the equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Here, the balance of equities tips in the Corps' favor.

The Corps provided evidence that it would lose approximately $150,000 if the scheduled release is enjoined. Moreover, if the TRO were granted and later dissolved after a more thorough preliminary injunction hearing, the Corps likely would be required to traverse the administrative approval process anew. Finally, given that dam maintenance is already long overdue, further delays will perpetuate ongoing concerns about dam integrity. When weighing the Corps' concrete harms with the speculative concerns of the District, the balance weighs in the Corps' favor. Accordingly,

//
//
//
//
//

---

[2] In 2010, the peak flow was 3,000 cfs for 36 hours.

[3] The USGS placed turbidity measuring stations throughout Lake Havasu. Station 25 was located at the intake of the District's pumping plant. The turbidity measurements discussed above correspond with those taken at station 25.

**IT IS ORDERED** that the District's motion for a TRO (Doc. 7) is **DENIED**. Given that the Corps' scheduled release is already underway, it appears likely that further proceedings are moot. The parties are therefore ordered to confer and, within **7 days** of the date of this order, submit either a proposed preliminary injunction briefing and hearing schedule or a status report indicating how the parties wish to proceed.

Dated this 15th day of March, 2018.

Douglas L. Rayes
United States District Judge