**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Central Arizona Water Conservation District,<br><br>Plaintiff,<br><br>v.<br><br>United States Army Corps of Engineers,<br><br>Defendant. | No. CV-18-00724-PHX-DLR<br><br>**ORDER** |

Before the Court is Defendant United States Army Corps of Engineer's ("Corps") motion to dismiss for lack of subject matter jurisdiction (Doc. 29), which is fully briefed. Plaintiff Central Arizona Water Conservation District ("District") requested oral argument, but after reviewing the parties' briefing and the record, the Court finds oral argument unnecessary. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f). For the reasons stated below, the Corps' motion is granted.

**I. Background**

The Alamo Dam ("Dam") is owned, operated, and maintained by the Corps. The Dam is located between Alamo Lake and the Bill Williams River. Thirty-nine miles downstream from the Dam, the mouth of the Bill Williams River empties into Lake Havasu. The District owns and operates the Mark Wilmer Pumping Plant ("Pumping Plant"), a water intake and pumping plant, in Lake Havasu.

In late 2017, the Corps announced plans to conduct a flushing-flow release from the Dam for mid-March 2018 to decrease water levels in Alamo Lake and allow for

maintenance work on the Dam. (Docs. 7-1 ¶ 36; Docs. 17 ¶¶ 27-28.) More specifically, the release's objective was twofold: (1) removal of accumulated sediment from the Dam's sill to ensure all structures were visible by the dive inspection team, and (2) lowering the water surface elevation to reduce the depth of the required dive and increase diver safety. (Doc. 7-4 at 6.) In early 2018, the Corps issued a draft Environmental Assessment ("EA") for its proposed release, to which the District submitted comments. On March 2, 2018, the Corps issued an EA and a Finding of No Significant Impact ("FONSI") for the Alamo Dam Flushing Release ("Release"). As proposed, the Release was scheduled to last 19 days, starting at 8:00 a.m. on March 12, 2018.

On March 6, 2018, the District filed a complaint alleging violations of the National Environmental Policy Act ("NEPA"). Concurrent with the complaint, the District moved for a temporary restraining order ("TRO") enjoining the Corps from initiating the scheduled release, arguing that the Corps violated NEPA in narrowly defining the project area, failing to consider reasonable alternatives to the Release, and in failing to prepare an Environmental Impact Statement ("EIS"). (Doc. 1 ¶¶ 94-125.) The District alleged that the Release would increase turbidity downstream, causing "long-lasting adverse impacts" on its Pumping Plant and to its water users.[1] (Doc. 7 at 20.) After holding a hearing on the TRO, the Court orally denied the District's motion, finding that the District failed to meet its burden of showing irreparable harm if the Release proceeded.[2] (Doc. 22.) The District did not appeal this order.

Prior to the commencement of the Release, the District issued a statement to its "water users" that it intended to "cease pumping at Lake Havasu in an effort to avoid pumping any initial turbidity spike from Lake Havasu." (Doc. 29-5 at 2.) As scheduled, on March 12, 2018, the Corps commenced the Release. (Doc. 29-7 ¶ 6.) During the Release, the flow reached peak velocity of just under 5,000 cubic feet per second ("cfs") on the evening of March 14, and tapered off to approximately 500 cfs 24 hours later. (Docs.

---

[1] Turbidity is the cloudiness or haziness of water and is a key test of water quality. The metric for measuring turbidity levels is called nephelometric turbidity units (NTUs).

[2] The Court's written order was issued on March 15, 2018. (Doc. 23.)

7-4 at 31-33; 29-4.) The Release was completed on March 29, 2018, and the flow returned to the base level rate of 25 cfs. (Docs 29-4; 29-7 ¶ 8.)

The District monitored turbidity levels throughout Lake Havasu during the Release, including at the Pumping Plant's intake. (Doc. 29-6.) According to the District's data, turbidity at the intake never exceeded 15 NTUs, well below the District's self-proclaimed "operational threshold" of 20 NTUs.[3] (*Id.*; Doc. 7-3 at 24.) Even though the turbidity level never reached the "operational threshold," the District decided to reduce pumping at the Pumping Plant late in the afternoon on March 16, completely curtail pumping on March 17, remain at no flow until March 21, and resume full pumping on March 25. (Doc. 30-1 ¶ 10.)

Presently before the Court is the Corps' motion to dismiss for lack of subject-matter jurisdiction, which argues that the District's claims are moot because the Release has been completed.

## II. Legal Standard

The Court must dismiss an action if, at any time, it determines that it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3). Mootness "pertain[s] to a federal court's subject-matter jurisdiction under Article III, [and is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A moot case is one which has "lost its character as a present, live controversy." *Hall v. Beals*, 396 U.S. 45, 48 (1969). In the context of a NEPA claim, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244-45 (9th Cir. 1988) (internal quotation and citation omitted). The burden of demonstrating mootness in NEPA cases is a "heavy one" and is born by the party claiming the case is moot. *See, e.g.*, *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001).

## III. Discussion

---

[3] According to the District, turbidity levels between 20 and 50 NTUs can require it to shut down the Pumping Plant. (Doc. 7 at 24.)

- 3 -

### A. The District's Claim is Moot

NEPA and its implementing regulations require federal agencies to file an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 USC § 4332(C). An agency that believes its action is not a "major Federal action," and therefore does not require the preparation of a full EIS, may prepare a more limited environmental review, or EA, to determine whether the full EIS is necessary. 40 CFR § 1501.4(b), (c). If the proposed action "will not have a significant effect on the human environment," the agency may issue a FONSI and need not complete an EIS. 40 CFR § 1508.13. NEPA is purely a procedural statute: "[it] does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (internal quotation marks omitted).

The Ninth Circuit has addressed the issue of mootness due to completion of an action under NEPA numerous times and has found that a case is not moot merely because the challenged action is completed. *Slockish v. U.S. Fed. Highway Admin.*, No. 08-CV-1169-ST, 2009 WL 10694163, at *8 (D. Or. Oct. 27, 2009) (collecting cases). Instead, in cases where "the violation complained of may have caused a continuing harm and . . . the court can still act to remedy such harm by limiting its future effects," the plaintiff retains a legally cognizable interest in the outcome. *Gordon*, 849 F.2d at 1245. The success of the Corps' motion, therefore, rises and falls on whether its alleged violations of NEPA cause continuing harm and, if so, whether that harm still can be effectively remedied.

The Corps contends that the Release has been "completed, the water cannot be returned to Alamo Lake, the flows and turbidity have [] returned to pre-release levels in Lake Havasu, and there are no ongoing effects on the turbidity or water quality in Lake Havasu." (Doc. 31 at 3.) The Corps' argument is supported by the District's own data, which reflects the lack of ongoing effects in turbidity. (Doc. 29-6.)

In response, the District asserts that this case still retains its character as a present, live controversy because the Court still can grant "effective relief." (Doc. 30 at 1-2.)

- 4 -

Specifically, the District contends that "[t]his case is not moot because the [] Release adversely impacted Lake Havasu's water quality, and the Corps can be required to study the impacts of this release on Lake Havasu . . . , and to adjust future high-volume releases to compensate for those impacts." (Doc. 30 at 9.) In support, the District relies on *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir. 2002) and *Gordon*, 849 F.2d at 1245, for the proposition that the Court still can mitigate effects caused by the Release. Both cases, however, "involved challenged government projects that had a secondary effect on the environment—that the government action was complete did not preclude the court from ordering the government to mitigate or reverse these secondary effects." *Feldman v. Bomar*, 518 F. 3d 637, 643 (9th Cir. 2008).

For instance, in *Neighbors of Cuddy Mountain*, the plaintiff alleged that a timber sale "unlawfully harmed old growth species, such as the pileated woodpecker and the great gray owl, in contravention of NFMA and NEPA." 303 F.3d at 1066. Despite the fact that the trees had already been harvested, the court found the case was not moot "[b]ecause harm to old growth species may yet be remedied by any number of mitigation strategies . . . ." *Id.* For instance, the court could mitigate injury to the old growth species by ordering "the Forest Service to study the sale's impacts on species viability, and, if necessary, to mitigate those impacts in both the area of the sale and elsewhere in the forest." *Id.* The court also could require "a more direct species population intervention, such as monitoring the birds' population trends and developing, if necessary, artificial habitats for their recovery." *Id.*

Likewise, in *Gordon* the plaintiffs challenged a fishery management plan increasing the permissible harvest of coho salmon in the 1986 fishing season. 849 F.2d at 1244. Even though the 1986 season ended during litigation, the court noted that the 1986 harvest could "have continuing effects on the population of Oregon coho salmon, and in particular on the number of coho that will be returning to Oregon waters to spawn in 1989 and on their progeny." *Id.* at 1245. The court therefore found a live controversy because "the damage can still be repaired or mitigated—obviously not by restoring the fish harvested in 1986,

but by allowing more fish to spawn in 1989." *Id.*

The plaintiffs in both cases clearly alleged a continuing harm—the reduced viability of particular species. In this case, however, the alleged harm—increased turbidity—has returned to below the operational threshold. At most, following the Release turbidity levels at the protective jetty for the Pumping Plant (which is located further from the Pumping Plant than those taken at the intake) reached between 31 and 41 NTUs. (Doc. 30-1 ¶¶ 12, 14.) To the extent that turbidity levels at any location other than the intake are significant, which is disputed, there is no evidence that the elevated turbidity level has persisted. (Doc. 29-6.) Accordingly, the District's claim is moot because there is no substantiated continuing harm for the Court to remedy. *See Feldman*, 518 F.3d at 643 (holding that case was moot where plaintiffs did not "face a continuous, remediable harm that concretely affect[ed] their existing interests.").

### B. No Exception to Mootness Applies

The District also contends that, even if there is no live controversy, this case falls within the exception to mootness for wrongs capable of repetition yet evading review. (Doc. 30 at 14.) The repetition/evasion exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Elec. Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). The "exception is a narrow one, and applies only in exceptional situations." *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985). The District, which has the burden of proving the exception applies, has satisfied neither prong. *Sample v. Johnson*, 771 F.2d 1335, 1342 (9th Cir. 1985).

#### 1. Duration

"For a controversy to be too short to be fully litigated prior to cessation or expiration, it must be of *inherently* limited duration." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (internal quotation and citation omitted) (emphasis original). "This is so because the 'capable of repetition, yet evading review' exception is concerned

not with particular lawsuits, but with classes of cases that, absent an exception, would always evade judicial review." *Id.* "The exception was designed to apply to situations where the type of injury involved inherently precludes judicial review, not to situations where . . . [review is precluded as a] practical matter." *Bunker Ltd. P'ship v. United States*, 820 F.2d 308, 311 (9th Cir. 1987). That is, when an inherent limit derives from an event that a court order can delay, the exception to mootness will not apply because "a court can ensure that a live controversy persists until the action is fully litigated by enjoining the challenged conduct until the litigation concludes." *Bowen*, 752 F.3d at 836. For instance, "[w]here prompt application for a stay pending appeal can preserve an issue for appeal, the issue is not one that will evade review." *Am. Horse Protection Ass'n, Inc. v. Watt*, 679 F.2d 150, 151 (9th Cir.1982) (per curiam); *see also Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 893 F.2d 1012, 1016 (9th Cir. 1989); *Oregon Nat. Res. Council, Inc. v. Bureau of Reclamation*, 52 F.3d 334 (Table), 1995 WL 163303, at *2 (9th Cir. Apr. 7, 1995); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, No. C14-1800-JLR, 2016 WL 498911, at *9 (W.D. Wash. Feb. 9, 2016).

The District argues that the Release "was clearly too short in duration to be fully litigated prior to its cessation" because it commenced "less than two weeks after the Corps issued the Final EA and FONSI . . . ." (Doc. 30 at 15.) The Court disagrees for two reasons. First, flushing-flow releases from the Dam are not inherently of short duration because the events could be stopped by a court order, thereby ensuring that a live controversy persists. Although the District failed to persuade this Court that it would be irreparably harmed in the absence of a TRO, the District potentially could make such a showing in a future case.

Second, the Release did not evade review; the District chose not to appeal the Court's denial of its motion for a TRO. Although a TRO generally is not appealable, when it "possesses qualities of a preliminary injunction" it is a reviewable interlocutory order. *SEIU v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010). A TRO is akin to a preliminary injunction where, as here, the "district court holds an adversary

hearing and the basis for the court's order was strongly challenged."[4] *Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1200 (9th Cir. 2013). The Court denied the District's TRO six days before the Release was to begin, yet the District made no effort to stay the matter pending appeal. (Doc. 22.) "[A] party may not profit from the 'capable of repetition, yet evading review' exception to mootness, where through [its] own failure to seek and obtain a stay [it] has prevented an appellate court from reviewing the trial court's decision." *Bunker*, 820 F.2d at 311. Accordingly, the District has not shown that the Release is an event of inherently short duration within the meaning of this exception.

### 2. Repetition

Under the capable of repetition prong, the plaintiff must make a "reasonable showing" of a "sufficient likelihood" that it will be subject to the same specific injury. *See City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983); *Lee*, 766 F.2d at 1390. The "mere physical or theoretical possibility" that a challenged action will again affect the plaintiff does not suffice. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). Here, the District has not shown a reasonable likelihood that the challenged activity will recur over its objection, particularly in light of the Corps' submissions to the contrary.

The District contends that "it is . . . reasonable to expect that the Corps will carry out similar high-flow releases in the future." (Doc. 30 at 15.) For support, the District highlights previous releases conducted by the Corps.

As a general proposition, the Court is unpersuaded that something will occur again simply because it has occurred before. As a factual matter, the evidence indicates the opposite is true here. For example, the Corps says it has "no plan for another flushing flow or lowering of the lake level at this time, nor is any anticipated to be needed to complete the currently scheduled repairs to the dam." (Doc. 29-7 ¶ 9.) Indeed, future maintenance now can occur by merely replacing the bulkhead and would not require drawing down Alamo Lake's water level. (Doc. 18-6 at 3.)

---

[4] The parties' TRO briefing totaled over 700 pages (Docs. 7, 17-20) and the adversarial hearing lasted over an hour (Doc. 22).

Moreover, if another high-flow release was to occur in the future, it would be covered by a revised Water Control Manuel ("WCM") and attendant EIS, not those currently at issue in this case. The Corps currently is in the process of revising the Alamo Lake's 2003 WCM and attendant EIS. (Doc. 29-8 ¶¶ 7-10.) In the context of NEPA, a plaintiff's injury is not the same where the defendant's conduct is subject to new regulatory findings. *See, e.g.*, *Madison v. Tulalip Tribes of Wash.*, 163 Fed. App'x 499, 500 (9th Cir. 2006) (appeal centering on whether EPA should have conducted an EIS or EA before extending coverage under general permit was rendered moot when general permit expired and was replaced by new general permit); *Feldman*, 518 F.3d at 644 (finding exception did not apply where challenge was to one-time process by which final EIS was approved).

Finally, even if a future flushing-flow release was considered prior to finalization of the revised WCM and attendant EIS, the EA and FONSI at issue in this action only pertain to the Release. The Corps therefore would need to perform a new assessment before conducting any further flushing flow-releases. Accordingly, the District has failed to demonstrate that it likely will be subject to the same specific injury in the future.

**IT IS ORDERED** that the Corps' motion to dismiss (Doc. 29) is **GRANTED**. The Clerk of the Court shall enter a judgment of dismissal accordingly and terminate this case.

Dated this 28th day of February, 2019.

Douglas L. Rayes
United States District Judge